ASSUMPSIT.

# Ray & Thornton *vs* The Bank of Kentucky.

### ERROR TO THE JEFFERSON CIRCUIT.

*Case* 137.

*Bills of exchange. Notice. Assumpsit. Mistake.*

*May* 31.

CHIEF JUSTICE EWING delivered the opinion of the Court.—JUDGE MARSHALL did not sit in this case.

The case stated and evidence.

THIS is an action of assumpsit, brought by Ray & Thornton, to recover back money paid to the Bank of Kentucky, at their branch at Greensburg, on a bill of exchange. Ray & Thornton, citizens of Lebanon, Ky. and traders to the South, had procured from Saunders, a wealthy gentleman of Woodville, Mississippi, as drawer, a bill of exchange, drawn in their favor and accepted by Throckmorton of New Orleans, for $1193 58, dated the 18th of February, 1840, payable on the 1st of November next thereafter; and having procured the names of their friends at Lebanon, David Philips, S. Spaulding & Co. and Floyd & Ray as accommodation indorsers on the bill, in July, sold, indorsed, and delivered the same to the Bank of Kentucky, at their branch at Greensburg. The bill was started, by mail, to New Orleans, by the Cashier of the Branch Bank, on the 24th day of October, and did not arrive till the 12th of November, on which day it was protested for non-payment, and notices immediately inclosed, by the mail, to the Cashier, and by him inclosed to the indorsers at Lebanon. It appears that Ray & Thornton were absent in the

South when the notices arrived ; that the plaintiffs' indorsers being uneasy and apprehending difficulty as to the effect that the protest might have upon their credit, and one of them having an accommodation in the Branch Bank, of three thousand dollars, Finley, Ray's partner in a mercantile firm, went immediately down to Greensburg, at the request of the indorsers, as well to see about the bill as to renew a note of $1000, which he and Ray had in Bank, and which they had been promised the privilege of renewing when it was discounted ; that the Directors hesitated to permit a renewal on account of Ray's being under protest on the bill, and consented to permit its renewal only on the payment of $500 down, and his assurance that Ray would come down and take up the bill immediately on his return from the South. Finley did not see the protest, nor did he doubt that Ray & Thornton were liable for the bill. He knew nothing about bills of exchange, and it was proved that Ray, though he had been a merchant for about twenty years, knew very little about such paper, the witness stating that he had never known him to have any thing to do with but one other bill of exchange before.

Ray returned in February, 1841, and went immediately down to Greensburg and paid and lifted the bill. It is proven by the Cashier, that Ray, before he paid the bill, knew that it had not been protested till the 12th of November, and that it had matured on the 1st and 4th, and expressed regret and fears that he might sustain loss on account of the bill not having reached New Orleans in time. The Cashier also stated that he did not know or believe that the indorsers were released, nor did the Directors, as he believed. It was also proved by the Post Master at Louisville, that according to the regulations of the mail, at the time the bill was transmitted, that letters mailed at Greensburg, for the South, had to pass through Louisville, and a letter mailed on the 24th October, could not reach New Orleans by the 4th of November. It is further proved, that a young man who was in the employment of Messrs. Henderson & Franklin, of New Orleans, had been furnished by them, with funds to pay the bill, and he inquired at every Bank in the city, and

Ray & Thornton
*vs*
Bank of Ky.

of the proper officers of the Bank, on the 4th of November, when said bill matured, for it, and would have paid it, but it had not arrived, or he could not find it. He instructed the officers of the Bank, that when it arrived that Henderson & Franklin would pay it: but when it arrived, on the 12th, it was not paid, the funds perhaps having been applied to other objects. It appears also, that Throckmorton, shortly after the maturity of the bill, failed and died wholly insolvent, about the time the bill was paid to the Bank.

The drawer of a bill of exchange is presumed to have funds in the hands of drawee until the contrary is proved: (*Chitty on Bills*, 198.)

That Ray and Thornton, and all the other indorsers were legally released and discharged from all responsibility upon the bill is unquestionable. And so also was Saunders, the drawer, unless it appeared that he had made no provision for the payment of the bill, nor had any funds for its payment in the hands of the acceptor; the contrary of which is always presumed, in the absence of proof establishing a want of funds: (*Chitty on Bills*, 198.)

That Ray knew that he and they were discharged when he paid and lifted the bill, does not appear: but the presumption may be fairly indulged, that he did not know or believe it. It is certain that the fact of his discharge was not communicated to him by the officers of the Bank; and as they did not know that the indorsers were discharged, as is proven by their Cashier, whose business it was to deal in such paper, the presumption may be indulged that Ray, who knew but little about such paper, did not know it. And though it is proven that he knew that the bill had not reached New Orleans in time, it does not appear that he knew, or that the fact was communicated to him, that the bill had not been mailed for that place until the 24th of October, and that mailed at that time, it could not reach New Orleans until after its maturity. Nor does it appear that he knew, when he paid the bill, that had it arrived in time, that the funds were ready to pay it off, and that it would have been paid, and he and all the indorsers discharged from further liability.

Instruction of the Circuit Court.

Upon the facts proven, the Circuit Court, at the instance of the counsel for the Bank, instructed the jury, that upon the whole evidence, the plaintiffs could not re-

cover, and that the jury having found accordingly, and a judgment rendered on their verdict, the plaintiffs have appealed to this Court.

We are clearly of opinion that the Court erred in the instruction given. The instruction is in the nature of a demurrer to the evidence, and should not have been given unless from the facts proven, and every reasonable inference that might be deduced from them, favorable to the plaintiffs, by a jury, they could not have found for the plaintiffs. Giving to the evidence this favorable interpretation, we think that it may be assumed as proven, that Ray, when he made the payment, was ignorant of the law by which he was discharged; ignorant of the laches of the officers of the Bank, in starting the bill in time; and ignorant of the fact, that funds were prepared, and had the bill arrived in proper time it would have been paid off, and that in consequence of the negligence of the Bank only, in failing to forward the bill in time, it was not paid, and the responsibility was thrown upon him, and his recourse upon the drawer lost; that in ignorance of his legal exoneration, as well as of the facts stated, he paid the bill. Upon these facts and conclusions, which the jury might have fairly deduced from the evidence in the cause, we think that it was not only their right but their duty to find for the plaintiffs.

*If indorser of a bill of exchange pay off the bill after protest, when he is legally exonerated, in ignorance of such legal exoneration, he may recover the amount back in assumpsit.*

It has long been a controverted question, whether a party could avail himself of his mistake or ignorance of the law merely, as a ground to exonerate himself from his civil obligation, or to rescind an executed contract, or recover back money paid. Able authorities, in England and in the American States, may be found upon both sides of the question. This Court took occasion to examine many of those authorities, in the case of *Underwood* vs *Brockman*, (4 *Dana*, 309.) And in this case we have not only reviewed the authorities there referred to, but have examined many others in the English Courts, as well as in the Courts of the States of this Union. We will not stop here to refer to those authorities, but will refer to two able numbers in the American Jurist, vol. 23, pages 143, 371, in which all the authorities upon both sides of this question are collected and compared,

*The case of Underwood vs Brockman, (4 Dana, 309,) cited and approved.*

RAY & THORNTON
vs
BANK OF KY. and the affirmation of the question maintained with distinguished ability. The review which we have made has confirmed us in the opinion that the principle settled in the case of *Underwood* vs *Brockman* is correct, and ought to be sustained. We admit that there may be a difference between executory and executed contracts; between the promise to pay and the payment of money, or rather, that it would require a more palpable case of mistake of law or of fact to rescind an executed contract, or to recover back money paid, than to resist the payment or enforcement of performance of an executory contract. The parties change sides in the controversy, and he who would be defendant in an executory contract becomes plaintiff or complainant in the action to rescind or recover back money paid, and the maxim, the better is the condition of the defendant, changes its operation on the parties. But the principle is the same in both classes of cases, the difference is in the degree or force of evidence necessary to make out or sustain the case.

Upon the whole we would remark, that whenever, by a *Where money has been paid under a clear and palpable mistake of either law or fact,* essentially bearing upon and affecting the contract, money has been paid *bearing upon and affecting the contract, without cause or consideration,* which in law, honor or conscience was not due and payable, and which in honor *cause or consideration, & which in law, honor or conscience was not due and payable, it may be recovered back.* or good conscience ought not to be retained, it was and ought to be recovered back. If this principle be applied to the facts in this case we cannot doubt that the plaintiffs should recover. We cannot doubt, that indulging in a reasonable deduction from the testimony, that Ray was not only ignorant of his legal discharge, but was ignorant and unapprized of material facts, which had he known, might have entirely changed his determination to pay, as they did in fact exonerate him from all the obligations of morality or honor to make payment. He might, as an honorable and fair man, have felt willing to waive any technical objection to the non-arrival of the bill, had the Bank done its duty in starting it in time, and especially when he was unapprized of the fact, that had it arrived in time, it would have been paid, yet not feel under any obligation in honor, in conscience or morality, to pay the bill, had he known that its non-pay-

ment and its entire loss had been produced by the gross negligence of the Bank, and not by any casualty on the way. Nor can it be presumed, that had he known these facts, and been also apprized of his and his indorsers legal exoneration, that he would have made payment. To indulge in such a presumption, would be to presume that he would, without cause or consideration, take upon his firm, voluntarily, a burthen visited upon them by the laches of the Bank, which legally rested upon the institution, and should, in good conscience and morality, be borne by it. Nor can the Bank in good conscience, morality or honor, retain the money; it has lost the amount of the bill by the negligence of its officers, and has received from Ray the amount, in ignorance of his rights, and in ignorance of facts which releases him from all moral obligation to pay it. Should they not refund the amount, and bear the loss produced entirely by their own negligence? Moreover, he had a right to expect that the Bank, whose business it was to deal in such paper, had done its duty, and would not set up claim for payment from the indorsers, if they were not liable. Under this conviction, and the pressure of his accommodation indorsers, who no doubt believed also that they were all liable, he hastened down to the Bank, immediately upon his return from the South, and had no opportunity to inquire fully into the facts, or to take counsel as to his legal liability, and relying upon the claim of the Bank as just, and as evidence of their right to demand payment, might not have conceived it necessary to do so, being thrown off his guard by his confidence in its officers, and their unequivocal assertion of right.

But it is said that he and his friends who were his indorsers, had accommodations in Bank, and might look for others, of which they might fear they would be deprived if the bill was not paid, and this may have furnished a motive to pay. So far from such considerations operating in favor of the Bank's conscientious right to retain, it furnishes an additional reason on the side of their obligation to refund.

If Ray acted under the pressure of such extraneous influences, he did not act freely, but under a kind of moral duress, of which the Bank, taking the advantage, had ex-

LEXINGTON &c.
T. P. R. Co.
*vs*
McMURTRY. acted from him money which was his own, and which he had a right to retain, and should, therefore, be deemed under a stronger moral obligation to refund.

Upon the whole, we are perfectly satisfied that the instruction was erroneous and the judgment should be reversed. It is, therefore, the opinion of the Court that the judgment be reversed and cause remanded, that a new trial may be granted, and that the appellants pay the costs of this Court.

*Pirtle* for plaintiffs: *Guthrie* for defendants.