## Posey, et al. v. Lambert-Grisham Hardware Company, et al.

(Decided January 23, 1923.)

### Appeal from Henderson Circuit Court.

1. **Deeds—Duress—Voided by Equity.**—A deed or other contract executed by one while in imprisonment or under duress, or in fear of violence to his person, may be voided on seasonable application to a court of equity.

2. **Deeds—In Consideration of Peculations—Upheld in Absence of Duress.**—Where a trusted employe in a mercantile establishment is caught stealing from the cash register and confesses that his peculations have continued from day to day through several years past, but is unable to state the total amount thereof, and his employer has no means of knowing the amount of such peculations, and they estimate the amount, and the employe in order to satisfy the claim of his employer for moneys thus stolen, conveys to his employer real and personal property of a value sufficient to cover the peculations of the employe in compromise of the said claim, the said deed will be upheld in the absence of clear and convincing evidence that the employe was under duress or in fear of personal violence at the time of the execution of the deed.

EDW. J. McDERMOTT, ERNEST WOODWARD and F. J. PENTECOST for appellants.

DORSEY & DORSEY and JOHN C. WORSHAM for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON— Affirming.

This is an appeal from a judgment of the Henderson circuit court, dismissing appellant Posey's petition praying the recovery of about fifteen or twenty thousand ($15,000.00 or $20,000.00) dollars' worth of real and personal property conveyed by him on February 16 1915, to the appellee, Lambert-Grisham Hardware Company. Very unusual are the facts of this case. Posey, when about nineteen years of age, was engaged by the appellee

company as bookkeeper in its hardware store in Henderson, Kentucky, at a salary of forty ($40.00) dollars per month. Posey was then just out of an Indiana business college where he had been studying for some fifteen or eighteen months, according to his evidence. He began work for the appellee company in 1907, and continued in its employ until the 16th of February, 1915, on which date he made the aforesaid deed. He had not been with the company long until he became a trusted employe. The store seems to have been a large one with a number of clerks. · In the store was a cash register having seven drawers. These drawers were used by the clerks for the deposit of the money and checks taken in on sales. At the close of the day's business it was the duty of appellant Posey to take these funds from the register and place them in the safe of the company, which was located in the office. He also made the company deposits in the bank and generally conducted its office and handled its money. Although the company had a large business through the years while he worked there it seemed not to have made a profit, and about the end of the year 1914, Lambert, who was manager of the store, and Grisham, who also worked in the store, conceiving that there was · a leak somewhere in the business, set about to find it and to stop it. On the night of January 27, 1915, they went to the office of the store and began to make an examination of its books. Incidentally they looked into the private papers of appellant Posey which were in the desk in the office and found he had a large bank account and quite a lot of real and personal property. This aroused their suspicion against Posey.· The cash register, when properly working, carried a slip on which were recorded all the transactions of the store during the day and totaled them at night, but this slip had not been placed on the machine for several months next before this time although it was the duty of appellant Posey to keep such slip on the machine. Observing this, Lambert put the slip on the machine so that it began to operate on January 28th. This slip showed the amount of sales of each clerk and the total amount of business done through the day, with many other bits of information. Without letting appellant Posey know it, Lambert and Grisham began to check up the register each night before the money was taken from it and they discovered that a few dollars were being taken from each of the seven drawers almost daily. This went along for several days. They finally

asked certain of their clerks to privately check their drawers and to make a record of the amount of their sales and the money placed in their drawers. This they did and found that the cash reported by appellant Posey to have been taken from the drawers was less than the amount actually put in there by the salesmen. After having obtained all this evidence and after having examined appellant's bank book and discovered he had been making deposits of from $25.00 to $100.00 to his credit on an average of two or three times a week, Lambert and Grisham, on the morning of February 16th, took appellant Posey to the third floor of the store building and accused him of stealing from the cash register. He denied the charge *in toto;* they then took him to the office of the president, Mr. Barrett, and there again accused him and he again denied the accusation. From there they went to the office of John Worsham, attorney for the hardware company, but Worsham not being in, Barrett went out to find him while Lambert, Grisham and Posey took a seat in the rear room of the office; soon thereafter Barrett and Worsham came in and entering the rear room closed the door. After this, according to the evidence of appellant Posey, the four men; Barrett, Lambert, Grisham and Worsham, accused him of stealing from the company and for about two hours imprisoned him and sweated him in an effort to make him confess he had been stealing from the company and to extort from him his property and money by threatening to indict and prosecute him for embezzlement, a felony, and cause him to be confined in the state penitentiary. Posey says, being without advice or counsel of friends, he was so frightened and harassed and intimidated that he finally consented to convey to the company, of which his tormentors were its principal stockholders and officers, his residence that had cost him $7,000.00; another house and lot in the town worth $3,500.00; a one-half interest in a farm worth $3,500.00; three or four building lots in a suburb of the city worth $400.00, and some stock in two or three corporations, and a bank account of more than $1,400.00, and other personal property, all of the value of $20,000.00 or more; that he was imprisoned and under fear and duress at the time he consented to so convey his property and at the time he actually executed the deed conveying the same to the appellee corporation, and that he would not have done so but for fear of personal violence from the said four men who were each larger than himself and physi-

cally stronger, and the fear that if he did not do so they would attach his property and issue a warrant for him and cause his arrest and imprisonment and would, pursuing a previously perfected design and arrangement, falsely accused him and convict him to a term in the penitentiary; that while in this condition he did reluctantly and unwillingly convey the property now in controversy to appellee corporation. He says that Barrett, Lambert, Grisham and Worsham promised him if he would convey his property to the corporation that they would not prosecute him for the theft of which they accused him, and further urged him to leave the state in order to avoid prosecution upon the charge, and for that purpose gave back to him, out of the funds forced from him, $500.00 that he might pay his expenses to Texas, to which state they suggested he go. Appellant Posey testified to all of the foregoing and was supported in part by the testimony of his wife, who gave evidence that her husband came home on February 16th, about one o'clock in the afternoon, in a very excited condition and was crying and in such a nervous state that he was unable to tell her in full what had happened; that she first refused to sign the deed conveying the property to appellee company but that she, out of fear lest her husband should be prosecuted and wrongfully convicted by the said four men upon a false charge of embezzlement, did sign the deed under protest; that she did so without the advice of any friend or lawyer; that the said four men refused to give her time in which to have such consultation and advice. A brother of appellant Posey also testified that when he went to the home of appellant in the afternoon he found appellant lying on the bed with his head covered up and crying and so nervous that appellant could not and did not give the witness any definite information as to what was the matter.

All this is denied in the evidence of Barrett, Lambert, Grisham and Worsham. Mr. Barrett is president of the appellee corporation and, according to the evidence, is a man of money and of wide business experience. Lambert and Grisham were in charge of the store, while Worsham is a lawyer of good standing in the community in which he lives. All four men are of good reputation and high standing. If, however, we should disregard all the evidence of Barrett, Lambert, Grisham and Worsham, we could not avoid the conclusion that appellant Posey had been stealing small sums almost daily from the com-

pany which employed him through a period of more than eight years, and that his peculations, though small at first, had become bigger and bigger with the passing of years until they amounted to several thousand dollars in the year 1914. The evidence tending to show appellant Posey's infidelity is overwhelming. There is no escape from the conclusion that he stole his employer's money and applied it to his own uses, most of it no doubt used to build the house which he says cost him $7,000.00, and to purchase much of the other property both personal and real which he owned and which was conveyed by the deed to appellee company which he now seeks to cancel. While Barrett, Lambert, Grisham and Worsham all testify that Posey confessed to them in the office of Worsham before he made the deed that he had stolen money from the company beginning about six months after he was employed in 1907 and continuing up to the day before his arrest when he became suspicious lest he was being watched— one of the employes having told him that the cash register was being checked up. Appellant denies he made such confession and denies that he took money from the appellee company, and insists that the property he owned was acquired by him in a legitimate way. He says, however, he began work for appellee company at $40.00 per month and later was raised, step by step, until he was receiving about $85.00 per month at the time he was discharged in 1915. He further testified that he paid about $30.00 per month for board at the time he received $40.00 per month for his services, and later he married and he gave his wife each month $40.00 for household expenses. During this time he carried life insurance which cost him considerably more than $200.00 per year, and had other incidental expenses which amounted to something. It, therefore, appears that he could not possibly have saved but a very small sum, if anything, from his salary in any year while he worked for appellee company. He says, however, that at the age of nineteen years he had about $1,000.00 or $2,000.00 which he had made in some way not explained and which he loaned on interest, and otherwise used and made money. If this be admitted—and it seems very doubtful—the interest on the largest sum, $2,000.00, would have been only about $120.00 per year. He inherited from his mother, who died in 1912, about $4,600.00. He bought and sold a farm on which he made some $3,500.00. He thus accounts for about $8,000.00.

As he denied *in toto* the charge that he took money from the store and refused to state the amount which he had taken, if indeed he knew, and thereafter conveyed his property to the company in compromise of its claim against him for money taken, he is not only in an unenviable situation but one from which equity will not relieve, unless it be that Barrett, Lambert, Grisham and Worsham, as agents of and for appellee company, by threats and intimidation coerced and compelled appellant Posey against his will to convey the said property to appellee company, in which event the transaction would be void and he would be entitled to a restitution of his property subject to intervening equities even though he had been guilty of the peculations charged to him. While the evidence of appellant Posey is sufficient to make out a *prima facie* case of duress on his part at the time he agreed to and did convey his property to appellee company, this *prima facie* case of duress on his part at the time he agreed to and did convey his property to appellee company is completely overcome by the evidence of the witnesses, Barrett, Lambert, Grisham and Worsham. Their testimony is not only more reasonable, direct and certain than appellant's but is supported in material parts by the testimony of others who did not and could not have had any interest in the matter except to tell the truth. Then, too, we cannot put much reliance upon the testimony of one who stands so thoroughly convicted, in the record, of taking the money of the concern that trusted him. His guilt is best established by the absence of the money from the cash register, the substantial losses sustained by the business, and by his own records, that is to say, his bank deposits shown by the duplicate slips and bank books which for instance show for the month of May, 1913, the following deposits: May 3rd, $25.00; May 5th, $40.00; May 9th, $40.00; May 12, $45.00; May 17th, $40.00; May 19th, $130.00; May 24th, $55.00; May 26th, $40.00; May 31st, $35.00; a total of $350.00 for a single month at a time when his salary was about $60.00 or $70.00 per month, and out of which salary he was either paying board or furnishing provisions for a home. Other months along about that time show like deposits. While the deposits at first were small and made only once or twice a week there is a pronounced progression both in the size of the deposits and the frequency with which they were made with the passing of the weeks, all of which is demonstrated by the records of the bank. He was wholly un-

able to reasonably account for all these deposits and for the further fact that he kept an account at two banks at which he made frequent small deposits of about the same amounts shown to have been taken daily by Posey from the cash register while he was being watched shortly before his arrest. The officers of appellee company only knew that appellant Posey had been stealing from the store—they had caught him at that—but they did not know for how long he had been taking money from the store nor the total amount of the thefts, but this estimate was made from his confession that he had been taking money for more than eight years. Figuring upon that basis and considering the amount of his average daily take-out, appellee's officials estimated that his peculations had amounted to $15,000.00 to $20,000.00 in the eight years. He said over and over that he wanted to make restitution. His property, they figured, amounted to some $13,000.00 to $15,000.00. He estimated its value at about $20,000.00. In compromise of their claim against him and to avoid attachment against his property he agreed to and did convey to the corporation his house and lot and other real estate and some of the personal property and money on deposit in bank above mentioned, and Barrett, Lambert, Grisham and Worsham gave back to him $500.00 and allowed him to keep his household furniture and certain other personal property. We are of course unable to tell with definiteness from the record the exact amount of money taken by appellant Posey from the store, and it may be that he conveyed more property to appellee company than was sufficient to cover his peculations, but in view of the fact that this goes only to the adequacy of consideration for the compromise and not to its existence, and the further fact that neither he nor his accusers, according to the testimony, knew the exact amount of money taken but could only arrive at the sum by estimation, there is no good grounds upon which to disturb the compromise agreement unless it was obtained by fraud, mistake or duress.

A compromise is defined in 8 Cyc., page 501, as an agreement made between two or more parties as a settlement of matters in dispute. A compromise, as other contracts, must be supported by a consideration, but the adequacy of the consideration can not be inquired into if there is something of detriment to one party or benefit to the other, however slight. Cruetz v. Heil, &c., 89 Ky. 429; 8 Cyc., p. 504; Harris, Speakes & Harris v. Kreigle,

&c., 197 Ky. 50. The rule is well settled that an agreement of compromise is supported by sufficient consideration where it is in settlement of a claim which is unliquidated, where it is in settlement of a claim which is disputed, or where it is in settlement of a claim which is doubtful. 8 Cyc. 505, 506 and note on p. 507.

In the case of Berry v. Berry, 183 Ky. 482, we held that where there is a question between the parties about which reasonable men may differ as to the outcome, the parties may adjust the difference between themselves by way of compromise, which will be upheld though it subsequently develops that one of the parties was right and the other wrong.

A compromise and settlement when full and complete and fairly made operates as a merger of, and bars all right to, recovery on all claims and causes of action included therein. 8 Cyc. 516.

It is the duty of courts rather to encourage than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims, and the nature or extent of the rights of each should not be nicely scrutinized. Courts should, so far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties; the consideration for such agreement is not only valuable, but highly meritorious. 5 R. C. L., p. 878; Titus v. Rochester German Ins. Co., 97 Ky. 567.

Duress that will avoid a deed is that which compels the grantor through personal restraint or fear of personal injury or imprisonment, to do what he would not do voluntarily. Hazelrigg v. Donaldson, 2 Metcalfe 445.

In the case of Edwards v. Handley, Hardin 615, we said: "Menace of corporal pain shall avoid a deed; but menace of his goods shall not. Noy's Maxims, p. 19. Menaces which induce a fear of loss of life, or member, of mayhem, or of imprisonment may void a deed; but menacing to commit a battery, to burn his house, or spoil his goods, is not sufficient to avoid a man's deed; for if these threats should be executed he may sue and recover damages proportioned to the injury sustained."

Duress which will relieve one from an obligation arises from a threat of a personal injury putting one in fear, and not from a threat of litigation. Harris, Speakes & Harris v. Kreigle, etc., 197 Ky. 50.

Applying the rule approved in the foregoing cases to the facts of this case, we are constrained to hold that

while appellant Posey was at the time of making the deed humiliated and ashamed at being caught by his associates in a theft from their common employer, and was uneasy on that account, he was not under that fear of injury to his person or of imprisonment which the law regards as duress and which will invalidate a solemn deed, but on the contrary he acted voluntarily in the execution of the deed in compromise and settlement of a good faith and virtuous claim for reparation of stolen money. The deed, therefore, can not be cancelled nor the conveyance of property under it disturbed.

Judgment affirmed.